The case this morning is No. 24-3348, Jane Doe v. Pine-Richland School District. Mr. Zimelon. Thank you, Your Honor. May you please court Walter Zimelon for the appellant, Jane Doe. Did you reserve time for rebuttal? I'm sorry, Your Honor. Thank you. Two minutes for rebuttal. Thank you. Okay. Very good. The appellant in this case was, at the time the lawsuit was filed, a parent of a child in the Pine-Richland School District who challenged Pine-Richland School District Administrative Regulation 103B. Regulation 103B states that, regardless of age, Under Regulation 103B, that right to privacy includes the right to keep information secret from parents or guardians. Section D of Regulation 103D goes further and states that, To ensure the safety and well-being of students, district personnel should not disclose a student's transgender status to others, including the student's parents-slash-guardians or district personnel, unless, One, legally required to do so, or two, the student has authorized such disclosure. Regulation 103B goes on to state that, When a student exhibits symptoms of transgenderism or gender dysphoria or gender identity issues, the student shall meet with a, quote, student support team made up of a school nurse, school psychologist, guidance counselor, principal, and others, quote, to discuss a timeline for the transition of the student in order to create conditions supporting a safe and accepting environment at the school. Regulation 103B excludes parents and guardians from that process as well. There's no dispute in this case, Your Honors, that the Due Process Clause of the 14th Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children. That principle... All right, but we're here for standing. So you need to connect together the law that you just mentioned with the facts of the case, namely the regulations. So why did your client have standing when her daughter did not seek out or invoke the protocols that you started your argument by describing? There's two reasons for it, Your Honor. Article III does not require the student to seek out or interact with a policy in any way. And the two cases that are paramount to that are the Northeast... Excuse me. Parents Involved, where Justice Roberts says that students do not need to apply to certain schools that are oversubscribed, that have a race-based program for admission, to actually have standing to challenge the race-based admission policy. And in Northeast Florida Chapters, the Supreme Court went on the whole that a government contractor doesn't actually have to bid on a project where there are race-based set-asides being implemented to have standing to challenge it. But those are in the equal protection context, where the injury is being forced to compete in a system with racial classifications. Isn't that unique in the nature of the injury, whereas here we still need to find that it's concrete and that it's actual or imminent? Your Honor, I don't know that it matters that there... It is true that those two cases cited, the Parenting for Better Schools and the Northeast Chapters cases, were 14th Amendment equal protection cases. But I don't believe that Article III has different standing rules for equal protection cases than it does for substantive due process cases, any more than it has different standing requirements for First Amendment cases. I think those cases are emblematic for the fact that you do not actually have to be inflicted and interact with the policy, as long as you need to contend with the policy, such as the appellant did here. The other issue is... How did the appellant's daughter interact with the policy here? Well, Your Honor, I think the focus and one of the errors that the district court made was focusing on what the appellant's daughter did pursuant to the policy. Now, if we look at Article III standing, what the Supreme Court has repeatedly said is that when there is a regulation whose focus is the regulation of a certain group or an individual, there almost certainly is standing. And that's what differentiates Clapper. That's what differentiates Lugin, where there are these third parties who are not directly regulated by the policy at issue, try to establish standing. And the court always differentiates that. Here, there has to be some acknowledgment by the school district that there is at least some regulation of parents. And that parent-child relationship. And that regulation is the student or the child getting to keep this information secret and the school getting to keep information secret from the parents. That's a regulation of school employees. Is there something in the policy that prohibits the student speaking with their parent outside of school? No, but it still nonetheless regulates the parent-child relationship because it unequivocally prohibits school employees from sharing that information. In fact, the school district said they would not share that information with the appellant, which in other circumstances courts have said once you unequivocally state you're not going to share that information with the parent, there is an infringement on the parent-child relationship and their standing. And I point to the Wyoming District Court's opinion in Wiley, which is most factually analogous of the district court opinions that have addressed this issue, where they said that once that no, we're not going to give it to you under any circumstance is stated, just as we have here by the school district, there is Article 3 standing. But not for every parent of every child in the district, right? I mean, we have to look at the specific allegations that Ms. Doe put in her declaration. Correct, which is, and this is a point that we made, it is Ms. Doe that is challenging it for Ms. Doe's harm. There's an allegation by the school district that it's... ...online videos about transitioning and has some friends who are transgender. And how does that equate to imminent harm? Well, I don't think she needs to... I think that what the district court did that there was an error was downplaying the gravity of the harm. As this court has repeatedly said, an identifiable trifle is sufficient to confer standing. So she has said here that I have a concern about my child's status. I went to the school and they said, under this policy, under no circumstances will we share any information with you about that child. That's a harm. That's a concrete harm that was inflicted. Now, we can talk about whether that concrete harm, Your Honor, whether it rises on the merits to a substantive due process violation. But it's an identifiable trifle that confers Article 3 standing. Even if that would be a concrete harm, Ms. Doe has to show that she is likely to be harmed... ...because her child is likely to approach someone in the school district and identify as potentially gender incongruous. And all she has said is basically her child is aware of gender transitioning and knows some people who are transgender. So why does that make it likely that Ms. Doe's child is going to identify to someone in the district as gender dysmorphic? Yeah, I respectfully disagree that in order to show the imminent harm, the child has to go to the school district. I think the school district's inflicting the harm is saying we have a policy. It's directed at parents, at least in part. It's directed at the parent-child relationship, at least in part. Pursuant to that policy, we will not share information with you. So that's concrete harm. And every parent would have standing to sue because every parent would be subject to this policy... ...if hypothetically and speculatively their child were to identify to the district as transgender? I think potentially. I don't think that... And that's not the situation before the court. This isn't class-wide relief. But what we're saying is if a parent in this situation, under the factual circumstances here, goes and says to the school... ...we would like you to share information with us about our child regarding this subject of gender dysphoria... ...and the school district says no, that's a concrete harm. The other concrete harm that is at issue here that does not require the student to actually interact with the policy is that... ...and this goes back to the Northeast Chapters and the Parents for Better Schools case... ...is that once the policy is in place and all parents know about it... ...they then have to change the way they parent to contend with the policy. And Ms. Doe does make these allegations. Again, I think that we cannot collapse the gravity of the harm for Article 3 standing with the merits. And that has been completely downplayed. That was completely downplayed by the district court here, which is, well, this is not a big deal. But take it into another concept or context. If a parent goes in and finds drug paraphernalia in a student's bedroom or a child's bedroom... ...and goes to the school district and says, you know, I have some concerns about whether or not my child is using illicit drugs. I found what I considered to be drug paraphernalia in the classroom. And the school district said, oh, don't worry about it. You know, that's not a big deal. Or the district court rather said, well, that's not a big deal. It's just drug paraphernalia. You know, you don't have any really a real concern here. That's the judgment of the district courts appointing the judgment for the parent. Again, that is delving into a merits issue. But certainly her concern for this is what she's pled. It certainly must be accepted as true. Whether or not ultimately it's sufficient to, on the merits, obtain a decision on a substitute process violation. It's certainly sufficient to confer her with Article III standing. In each of the cases that the district court relied upon to jettison standing, those cases, each of those cases support Ms. Doe's claim for standing. For example, in the Fourth Circuit opinion, which dealt with a similar policy, the Fourth Circuit specifically points out that the plaintiffs there did not allege, as Ms. Doe did here, that there was a struggle by any of their children with gender identity issues. Again, Ms. Doe did that. In the Wisconsin district court's ruling in Parents Protecting Children, the district court noted that no parent or guardian has been denied information regarding their child's identity, gender identity. Here, the district court, at the time the complaint was filed, did just that. And the Northern District of Iowa's holding in Parents Defending Education, the third case cited by the district court stated no one has been denied information about their child's gender identity or gender support plan. Again, Ms. Doe was doing just that. She was taking the school district at her word at the time the complaint was filed. And if you look at the appendix on page 127 through page appendix 128, that is the Second Amendment complaint where those averments are made. But if the nature of the injury is the decision not to disclose information on this subject, how is there injury if there is no information on this subject? Don't you need to at least show some connection between the student and the policy directly, not just that this policy exists so every parent is then injured? Well, the problem with that, Your Honor, is that a plaintiff's Article III standing under a secrecy policy like this is dependent entirely on whether the school district is successful in keeping it secret. If they're successful in keeping it secret and the parent doesn't have the information, the parent doesn't have standing. This is what was grappled with. Where does this idea of a special secrecy standing rule come into play? I mean, Clapper, that information in the normal course would be secret. But the court still looked at whether the chain was too remote. I don't know that Clapper ever deals with whether this information would become secret or the secrecy of the information at all. I think Clapper dealt with a very specific, as Justice Alito said, that, look, we're dealing with a heightened standing requirement here because this is an issue of national security. This court in Constitutional Party really cabins Clapper to these issues of national security and has not expanded it. That's the one case that this court has addressed Clapper. And in Judge Ambrose's dissent, he says, look, Clapper should apply. This chain of hypothetical events is present here. Why aren't we applying Clapper? And the panel majority in that case rejects that and says, look, Clapper is really limited on its facts. The Supreme Court has applied Clapper in numerous contexts outside of national security. I mean, the Affordable Care Act alone. Well, I think the way this circuit has applied Clapper has said that Clapper's hypothetical chain of events scenario applies really to a national security context. That's what this that's the panel majority is holding in Constitution Party. And I understand my my my time is over. I mean, the rebuttal time now, Your Honor. But you're on our time. OK. The problem, but getting back to the secrecy problem, which was not addressed in Clapper, but was addressed by the Fifth Circuit in D'Andrea, which is discussed in our brief, is the issue of secrecy is as follows. If you have a secrecy provision like this in a school district policy and the school district's policy is successful and the information is kept secret, a parent has no standing to challenge the policy because they don't know whether or not the child has ever went, gone to the school district, availed themselves of the policy, shared any information from them. But when the policy is not successful in keeping it secret and somehow that information gets out to the parent, the parent then has challenge standing to challenge it. So it really what by the secrecy provision creates a standing regime that hinges on whether or not the information can be kept secret. Now, keep in mind, standing, as we've said, and there's a court as well, where is addressed at the time of the complaint is filed. At the time the complaint was filed, appellant had no idea whether her daughter had gone and availed herself of this policy or not. It was only ironically, notwithstanding the secrecy provisions, it is disclosed to the district court in a declaration in opposition to the appellant's petition for a preliminary injunction that, oh, the child has never availed herself of this policy, has never interacted with this policy in any way, and therefore they do not have, at least at that point, they do not have sufficient evidence of an imminent harm that would suffice to undergird a preliminary injunction. Now, we're not here on whether or not a preliminary injunction was properly denied. We're here on Article III standing as to the merits of the complaint. But keep in mind that they breached their secrecy policy to, after the fact, to tell the court that, oh, well, there's no standing here because you have nothing to worry about, essentially, plaintiff, because your child has never come to us regarding this policy. So essentially what a parent has to do is sue and then have the school district come out with a declaration saying, oh, well, now we can tell you that there's nothing to worry about despite your concerns. Your child has not had any interaction with the school district pursuant to this policy. I think that really illuminates the problem with these secrecy provisions in similar policies, not only in the Pine-Richland School District, but in other school districts as well. Thank you, Your Honor. All right. Thank you, Mr. Zimwong. We'll hear your rebuttal. Let's hear from Ms. Lane. May it please the court, Christina Lane on behalf of the Pine-Richland School District. With your leave, we had submitted a allocation of argument time wherein I would discuss the lack of standing actual harm for 10 minutes. And then my co-counsel, Ms. Doherty, would speak to the speculative harm and self-inflicted harm. When was that submitted? Friday, Your Honor. Okay. All right. Just in the future, try to – I was taken by surprise when I saw the minutes because we got the minutes a week ago and it wasn't indicated. So in the future, if you could try to submit that farther in advance, we'd appreciate that. I appreciate that. Yes, Your Honor, I would definitely take that. The case here is truly only about standing where Ms. Doherty is required to be among the injured. She has not met her burden in demonstrating an injury in fact for standing. She is required to allege a concrete particular, which means particular to herself, involving her child that is actually happening or imminent, meaning it's realistic and impending to harm caused by the Pine-Richland School District. In addition to that, that will be addressed more fully by Ms. Doherty, it has to be fairly traceable to the question policy and then redressable by a favorable ruling, the request of judicial relief. Here, the policy at issue, which is AR 103B, does not have a secrecy provision built into it. In fact, the language of the AR itself actually states that parents most often are aware when their child is struggling, perhaps with gender identity, and that their focus and intent is certainly to involve parents, which comes out with the declaration of the superintendent, Brian Miller, that offers that any children that are currently under the support plan, all parents are involved in that situation. The AR says that there's an exception if the child presents to the school district and then speaks to allegations of harm in the event the parents become involved. And that is really going to be a fact-intensive conversation between the child and relies upon what the child is reporting. So I just want to be clear that the policy at issue here does not include the secrecy provision. Now as to what... You just said that there is the potential for secrecy if the facts support the need for it, is that correct? If the facts support that there are allegations of harm, the district's not going to disclose at that moment, but the district will also take additional steps it's required to do under child abuse or child protective services. So it's kind of a wait, let's stop, what do we understand that we have here as far as what the child is reporting? In order to allege facts to support standing, what would a plaintiff have to allege? As the most cases that have found standing, the child, the one case is that the parent was allowed to move forward because the child's name was changed, pronouns were changed, and then also was participating in counseling at the school on this transition. And that the court in Lander really analyzed that participation in counseling is kind of placing at issue under parental due process rights, the right to care, custody, and control, and the acceptance that under that is the decision making as to medical. How would a parent know that the child was participating in counseling at the school? In the Pine Ridgeland plan, the focus is to include parents, and only would not include parents if the child claims harm. I guess I'm just trying to get at the standing, like what needs to be in a complaint? So right now we have a complaint that says, I have concerns that my child might be gender dysphoric based on my child's interactions and exposure to gender dysphoria, basically. And you're saying, all right, if you know that your child has identified as transgender, changed pronouns, and is getting counseling at the school, that's enough. But there must be some line that we can draw for what you need to allege to have standing here. Yes, your honor, and the line is here, as in all the cases, that there must be something more than just the concern that the policy may apply at some future point. We have to understand exactly what Jane Doe was claiming she understood about her child. That she found the child in her home viewing videos, and maybe looking at websites, and that she's recently understood her child to have new friends. That's it. Well, those are present harms, or present concerns, present concern of harm. They're concerns of a parent in their home that has absolutely no connection to the school district. Well, the connection to the school district is, well, let's change the facts a little bit. Let's say that at home she saw her daughter looking at videos of people who suffer from anorexia nervosa, okay? And let's say then she was also hanging around with a new group of friends, and those three or four friends were all visibly extremely thin, okay? And looked very unhealthy. So she goes to the school district and says, hey, I'm concerned about my daughter. She's looking at these videos. She changed her group of friends, and I'm concerned that maybe she has anorexia or is starting to be interested in being thin because she's very uncomfortable with her body. And the school district says, well, we appreciate that, but we have a policy here that says that we don't talk to the parents about anorexia. Would she have standing or not? In that particular case, the child does not have a right, as this court has recognized and the Supreme Court has recognized under due process, that there is a right to privacy on these issues of gender incongruence. With the issue, as you've suggested in the hypothetical, that the student is having a health issue, the school districts would not bar that information. We would never have a policy. Well, now you're just fighting the hypothetical. I gave you a hypothetical. I'm asking you, on the hypothetical I gave you, would that mother have standing? I tried to give you facts that map almost identically onto the facts of this case, except I've substituted anorexia nervosa for gender dysphoria. In your fact pattern, the child has been researching anorexia and is also showing signs of losing weight. No, no, no. She's now going to lunch with a group of three people who are obviously thin and have identified as suffering from anorexia. She's looking at videos online at home of people who are very thin who are talking about their experiences. Yes, Your Honor, under that, the plaintiff would not have standing. No standing. Because it's just fear of some projection of harm. It's not actual. You have to wait until your child actually has anorexia nervosa before you would have standing. Well, in this particular case, you have to actually have some notice to the school district, almost as an opt-in from the minor child seeking assistance under the law. Well, no, not the child, the parent. The parent goes to the school district and says, I'm concerned about my daughter based on everything I just hypothesized. And your response is, well, no, the school can say that we can't talk to you, mom, about anorexia nervosa because your child hasn't authorized us to do that. And as soon as your child does authorize us to do that, then we can engage you on that subject. In the AR currently, under Pine Richland, and using your scenario of anorexia, if the child reports to the district, I need a support plan because I believe I'm experiencing anorexia, that is the opt-in. And that begins the conversation with the district as to what do your parents know. Yes, and then the district says to the child, we'd like to contact your parents about that. And the child says, oh, no, no, do not contact my parents because they're force-feeding me at home. And under the policy as written, the district would protect the student under allegations of those harm. So the parents are out. In that scenario, yes, under the health and safety exception. All right, then when does the standing happen? The standing happens after the child is hospitalized, after the child, when, standing has to occur at some point. There has to be an imminent harm at some point. What's the triggering event or events that would cause, where it would go from no standing under the situation we just talked about to where the parent would have standing? Has the district court correctly analyzed all the cases that are looking at very similar policies? Although I would suggest to you that our policy amongst Pine-Richland sets forth that premise and intent of wanting to work with parents. And only sets forth there's an exception in the event of a health and safety emergency. But in all of those, the need is for the child to actually have engaged under the policy. Because there's cases where the courts aren't even hearing it when the child used pronouns. No, but stick with our example. The child engaging with the policy, but the child tells the school district, don't contact my parents. When does the parent have standing? When does the harm occur? Never? The child just goes about living as an anorexic and the parents never have standing. Unless the child authorizes the school to talk to the parents. Under the policy, that exception is only if there's a health and safety emergency. And in that particular premise, they're not going to share with the parent until they can work out and identify how to directly provide to the student and the parents what that health and safety issue is. Ms. Lane, can we go to fundamentals? Because you're describing a policy that's different than I thought we were addressing today. If I'm hearing you correctly, it sounds like you're saying if a student approaches the school about being transgender or wanting transgender support, that the default is that parents will be notified. And that is only in a circumstance where the parents pose a health or safety threat to the child that the parent would not be notified. Is that what you're telling us the school's policy is? It's in the appendix at 16 and it goes over the privacy and confidentiality. So it's certainly recognizing, as the course has recognized, that the child has a right to privacy. And it goes into the child controls in the school environment, how that information is shared. But then says, following that in the next paragraph, that typically the parents are involved in these types of situations and are aware. And that's the premise that we want to share with parents. Since parents and guardians are generally aware of their child's development, notifying may be unnecessary. That's just descriptive. Right. But where does it say that the policy is to notify? I mean, what I'm reading here, and I thought we were addressing as to standing, is to ensure the safety and well-being of the student, district personnel should not disclose a student's transgender status to others, including the student's parents, unless legally required or the student authorized. So the default is it can't be disclosed. Are you telling us that, notwithstanding the way it's written, that the default is the opposite? Legally, that phrase, unless we're legally required to, it's the child. Again, we're engaging with the child. Our premise is to first start involving the family or at least assist the child in involving this family. In the case of where there is a safety issue, that's when the family will not be involved. That the district will not outreach to the family. But unless there's an indication that the parents pose a health or safety risk to the student, if the student discloses their interest in being transgender, the school does notify the parents? Since parents and guardians are generally aware of their child's development, notifying a student, parent, guardian about his or her gender identity issues or transmission may be unnecessary. And then it goes on to say, in some cases, however, disclosure about the student carries risk for the student, such as physical and emotional abuse and abandonment. And that's where they're setting that carve out. That the premise from the policy, and as in the declaration shared by Dr. Brian Miller, is that the district has been focused on certainly supporting students, acknowledging the students, but then working with parents involved in this particular situation. But the statement that they may be aware doesn't equate to they will be notified, right? It's a recognition that most often that children who are struggling or beginning to express themselves differently, their parents will most likely be aware. And that there is not a need to... But what if they're not? Then how does the policy work? The policy would then first focus on working with the student to inform the parent. Do your parents know that you're asking for these provisions in the school environment? The only time that the district is going to not on its own notify or suggest to the child, let's have that conversation with your parents, is under that health and safety premise. But what if the student says, no, I don't give my authorization for disclosure? The student controls at that point in time that there's going to be more conversation with the student. The student has that as recognized in the policy, the right to privacy, but that the intent of the district is still always to include the family. But unless and until the student gives their authorization, there is not affirmative notice to the family or to the parents? It's part of that counseling, as suggested by that group of the support team, that their focus would be meeting with the student, understanding what the student is needing, who knows who they want to share the information with, and having that important conversation of what do your parents know? What do you need in the home environment? I understand, but I'm just looking for is it yes or no, that unless and until the student gives their authorization, there is not notice given by the school to the parents under the policy? There's not a formal notice document that would go out from the district? Yes or no. Correct. And that's consistent with what happened here. Doe said, you'll tell me, right? And the answer was, no, we won't tell you. We had to look at the context of when she was seeking that information. She went out, the child had never availed themselves of the policy. Well, she found that out after the declaration was filed, right? We found that out when we understood who the Doe plaintiff was at the point in time, their initial filing. What I'm saying is she found out, Jane Doe didn't find out that her child had not sought to invoke the policy until litigation had already been filed, correct? I think in the affirmative, but the only accusation from the parent is, I think my child is investigating this. That's it. But that was in her home with no connection to the school district. The child never availed themselves or sought any type of service or conversation with the district. But Jane Doe did engage the school district and said, look, if my child comes to you under the policy, please let me know, right? Or demanded that she be advised. And the response from the school district was consistent with the policy you just went through with Judge Krause was, no, we don't do that. Right, we're going to follow our policy. We're going to follow our policy. At the context of that conversation, there's no issue with your child. We can't agree to provide you notice in three days because it's inconsistent with the policy. So that's how that conversation. If the parent pleaded in their complaint on information and belief that the student had approached the school, would you be arguing that there was no standing? If there was no record of any approach, any request for any type of conversation service under the 103B, yes. That would not be sufficient. That would still be that I think it may, possibly my child sought protection. But whether that actually happened or not, that only comes out with discovery, right? In this particular case, you don't get discovery because we don't have the whole. I'm not asking about that. I'm asking whether in a case where someone, a parent pleaded that on information and belief, the student had sought the support of the school's student support team. Is that enough on the face of a complaint to establish standing? I would suggest to you no because under particular theory of relief that is brought forward, which is parental rights, which are not absolute, that there has to be a connection, as this court has held, where there is compelled conduct that is going to interfere with the familial relationship. There is no evidence of any compulsion by Pilon-Richland School District. Now, the plaintiff in Ms. Doe can use language that suggested that those are conclusory allegations that have not occurred. No one has interfered with her familiar relationship. There hasn't been a wedge, which are typically found in the cases where children were removed and not returned. That goes to the foundation of the family entity. And in this particular case, none of those allegations are present. I see that I'm out of my time. Any more questions for me? Thank you. All right, thank you. We'll hear from Ms. Doherty. May it please the court. Good afternoon. Jamie Doherty on behalf of Appali Pine-Richland School District. There are a number of issues and questions that were raised by this court that I think I will address in my presentation on the issue that the injury in this case, there is none. The potential harm is speculative. It is not concrete. It is not actual. It is not even imminently impending. When would the harm not be speculative? Thank you, Your Honor. Yes. The harm would not be speculative if there had been some sign that student in this instance had reached out to administration to ask questions, to identify a concern with respect to gender or gender identity. Can I refer to that shorthand by saying invoking the policy? That's correct. Okay. So if Jane Doe's daughter had invoked the policy, then Jane Doe would have standing? Yes. Okay. But Jane Doe isn't going to know whether the child invoked the policy unless the child says it's okay to contact my mom. So that's not true. That's not true. Okay. And this I think goes to some of the issues this court was raising, if I may explain why I say that, Your Honor. In the policy itself, again, this is part of our appendix at page 16, as my co-counsel referenced, under privacy and confidentiality. Within the last paragraph in that section, there is language that says, certainly it begins to ensure the safety and welfare of the student. We've talked about that already.  Just pinpoint where you are on page 16 of the appendix? Yes, Your Honor. Under section D, privacy and confidentiality. D. Okay. Are you there? Yep. And then under the last paragraph, which begins to ensure the safety and well-being of the student, that part I think was discussed by my co-counsel. I'd like to ask the court to skip ahead to the second sentence there, which begins, relevant school staff, such as the building principal, guidance counselor, and school psychologist. And those people are not accidentally named. Those are the people who are identified by the administration under this regulation, which I think one of this court correctly pointed out is really a policy for how administration should handle and act with respect to this very sensitive privacy information. So it goes on to say, we'll work actively and immediately to discuss disclosure to parents' guardians, given their legal rights, and the importance of collaboration between the school staff, student, and parents slash guardians. So this is circular. The first sentence says, we'll inform the parents if we're legally required to. And so then the second sentence says, well, we acknowledge they have legal rights sometimes. So I think everybody agrees that if the parents have a legal right to this information, they get it. But the default is still, the first sentence says, unless they have a legal right or the student has authorized a disclosure, district personnel should not disclose it. And notwithstanding any active attempts to negotiate with the student about this, the default is, shall not disclose. Thank you. I would suggest to the court that this is, practically speaking, a modifier that is in actuality how these district personnel behave. I would also tell you, based upon Dr. Miller's declaration, that there is, and my co-counsel referenced this as well, I want to take it one point further. There is, in fact, a number of families who are supported by this policy in the district at this time. Not one of them is in a situation where a parent is not aware. I will also tell you that as a practical matter, there were not steps taken to support the use of requested pronouns, et cetera, et cetera, until parents and student could agree to notify parents or bring parent into the loop. In every instance except where a student comes to the administration and says, if I go home and declare to my parents that I am transgender or I'm questioning gender, I am going to be put out, I am going to be beaten, I fear that there could be death. Those are the situations where there is an active attempt by the administration not to talk to parents and then to deploy other resources like the Child Protective Services. I guess I'd like you to focus a little bit on the actual allegations in Ms. Joe's declaration because as Ms. Joe's counsel said, we assess standing at the time of the complaint, the language of the policy is what it is. There is some language that says the default is the district is not going to disclose. My question to you is, does Ms. Joe, based on her declaration, have standing under that policy? Unequivocally, no. Why? Because the question that Ms. Joe asked of administration and this came up previously was, may I have notice if my student were ever to present under this policy? That answer was no. That answer was not no in such a way to confer standing. The answer was no because one of the first things this policy requires this administration to do. Excuse me. I refer to it as a policy. It is not a board level policy. It is an administrative regulation that has a different set of review. It's simply how the administration works. That to give Ms. Joe notice that her child had availed themselves of the policy would fly in the face of the very point of the policy, which is that a security and safety assessment must be made first. So it was not a no, we're never going to tell you. It's important that the court understand the question that was asked. The question that was asked was, will you give me notice if my kid comes to you and says I might be questioning gender? That answer was no. See policy. Policy says we have to work to do this assessment. This sounds like a different answer than we heard from Ms. Lane about how the district interprets and exercises the policy. I don't think it's different. I think we were saying the same thing. I think we're saying it slightly differently. And I think Ms. Lane was referring you to a different section of the AR. I think you were being referred to the student transition sections, which is E, which is I would suggest to the court one step further than what we're talking about under D, which is privacy and confidentiality. For example, there may be instances where a student says I have some questions about gender. I have some questions about my gender. That's a different approach than I am thinking about transitioning. In both cases, we don't have these facts here. And that's really where the focus from our perspective should be on whether there is harm, whether there is an injury. No, this is exactly the same as Jane and John Perrins won in the Fourth Circuit. This is exactly the same as the Eau Claire decision. I think you're maybe pushing the envelope a little too much there because Jane and John, John and Jane Doe, the Fourth Circuit, Judge Quattlebaum's opinion, I'm going to read from it. The parents, and this is, I'm not sure what page of the reporter is. It's right before Roman 1. The parents have not alleged that their children have gender support plans. Correct here. Hasn't happened. Are transgender? Correct. Hasn't happened here. But here's where I think you're on much weaker footing. Or are even struggling with issues of gender identity. Here we've got a pleading that says my daughter's looking at TikTok videos of transitioning. Well, and she's hanging around with a new group of friends who are involved with that. So that's an important distinction between your case and the Fourth Circuit. And then also the very next sentence says they have not alleged that the Montgomery County Public Schools have any information about their children that is currently being withheld. Correct. That's good for you. But now here's what's bad for you. Or that there is a substantial risk. Information will be withheld in the future. Well, Doe has that in spades here because Doe is saying if my daughter expresses anything about gender, please get in touch with me within three days. And the school district's answer was C, policy. And we've gone through the policy with Judge Krause's questions and my questions. So you've got two important distinctions there where we could we don't even have to disagree with Judge Quattlebaum's opinion to rule in favor of opposing counsel. Isn't that right? Respectfully, Your Honor, no. To say that my child is looking at videos and is hanging around with new friends is significantly different than to say that there is a serious consideration of gender identity. Struggling with issues of, I mean, again, let's change up the hypotheticals. I'm concerned about my child. I think that she's doing drugs. Well, why? Well, because, you know, she used to hang around with her friends on the field hockey team. And now she's hanging around with a bunch of kids that are known to be pot smokers. That's not that's not that's not enough for a normal. That's like abnormal parenting to say I'm concerned about the direction my kids go. I didn't want to interrupt. Thank you, Your Honor. I'm glad we've come back around to drugs, because what I would say about that is the district does have duties there where the child's medical safety is at issue. Because it's an illegal substance. Change it to go back to anorexia nervosa. Same thing. It is potentially where the child is at risk of physical harm. Then I think the district, according to their own policy and the language of their own policy, not every thin child is at risk of anorexia. That's an assessment that is properly placed and has been placed for generations in the school personnel. There are children who speak under under this in this school district. If a parent went and said, I'm concerned that my child's not eating healthily and concerned about her weight. Can you can you converse with me about that? Pine Richland School District says no, not unless the kid gives permission. No. What does the district say in that? The district receives that information and speaks with the child. And then there may be a situation where the parents have to be involved. So the parents might be cut out of that situation as well. There's a potential. OK. All right. I appreciate that. That's a very different issue than what we're speaking about here with respect to transgender rights and the students right to privacy with respect to those rights. And so, again, just from from our perspective, the there is no there is no actual concrete particularized injury. There's also no immediate threat of harm here. What we did learn and what we do know from Dr. Miller's declaration, which was filed with respect and in response to the preliminary injunction opposition. But is part of the record in this case is that there was no outreach of any kind, certainly no attempt to seek support under the policy. But less than that, further down that line, there was no question or inquiry. In fact, the interaction with this particular child, Ms. Joe's child, was nothing more than routine relative to scheduling of classes at the very basic level. And so no harm did not avail themselves of the policy. No evidence that there was a question about gender identity. And there was no information kept from the parent by the school district here because the school district had no information. Can I can we get some clarity around what it is we're reviewing here? Is it is are you telling us that the school district interprets the policy such that if a parent asks to be notified, if their child identifies as transgender, that the school's answer in practice under the policy is, yes, we will notify you after we assure ourselves that that notification will not result in harm to the child. It may be that I don't know that it's a straight yes. Candidly, Your Honor, I think there is an assessment that is involved. What assessment is involved? The assessment to safety and security of the child. That was built into my hypo. Yes. So I think that the district works cooperatively with the child to bring the parent into the fold. I do not think the district, if the child says no and can't be moved from that position, the district is not going to the parent. No. And that's regardless of whether there is a threat to the health or safety of the child. That's correct. OK. That has not been the case in this district. And it is also not the case that the district would then actively engage in the or honor the requests of the child. You know, in other words, if the child is saying use these pronouns and not others, there's a whole discussion that takes place. For example, if you want these pronouns and you don't want your parents involved, understand, child, there may be a situation where you are being referred to in one way in the classroom and in another way at home. And there may be children in the classroom who are living in your neighborhood who may disclose that that conversation is all happening where there is an assessment made that safety and security are not at risk. There is every attempt executed and exerted to bring the child into the point where there's communication with the parent. I understand. Thank you. All right. Thank you very much. Miss Doherty. We'll briefly hear rebuttal. Mr. Zimalong. We will probably hold you to the clock, notwithstanding what has happened so far this morning. Thank you. You have two minutes. Yes. Thank you, Your Honor. The appellant appellee's argument boils down to a merits based argument. And there is multiple instances where they argued facts that weren't in the record. The assessment of Misto's standing is based upon what she pled in the complaint and all reasonable inferences taken there from. So why didn't you plead in the complaint that on information and belief that her child had veiled herself with a policy? Well, I think we do. We think what we've pled in the complaint is sufficient to demonstrate a harm. Where is that allegation? The specific allegation, Your Honor, of upon information and belief, Doe's daughter veiled herself with a policy. That's not present in the complaint. But even if it were, even if the complaint were lacking, it's not a dismissal. The appropriate relief would not be a dismissal with prejudice, as the district court did here. It would be a dismissal without prejudice with leave to file a complaint with additional facts that could demonstrate Article 3 standing. And in this instance, it was a dismissal with prejudice. But again, all of the arguments against standing are predicated on facts that aren't of record, how the school district interprets a policy, their context of the conversation. We don't know what the conversation is because discovery hasn't taken place. And it would be inappropriate for the court to consider any of that because we're limited to the facts in the complaint. We're here on the facts of the complaint as pled as to Article 3 standing. The other point I wanted to make is this issue of this right to privacy, that the student has a right to privacy, and that right to privacy includes the right to keep information private from a parent. That court has never been recognized by the United States Supreme Court. It is not recognized by this court. Following Dobbs, it is highly doubtful that it will ever be adopted by any court that a right to privacy, that a student or a child has a right to keep information private from a parent. And for those reasons, Your Honor, we respectfully request that this court overturn the decision of the district court. Thank you. All right. Thank you to counsel for all sides. The court will take the matter under advice.